

# Exhibit
# 3
## (Part 2)

## G. SHIFT AND LOCATION PREFERENCE:

Within sixty (60) days of the signing of this Agreement, employees in each unit covered by this Agreement will be allowed to select shifts and work locations in accordance with their seniority within the department within their classifications insofar as it does not adversely affect the operation of the department.

Exceptions to this provision may be made in the Local Supplements to this Agreement. Upon request, employees will be furnished starting and quitting times information prior to submitting their preference. It is understood that hours, shifts and work locations are subject to change as operating needs may dictate. During the period when employees have the opportunity to submit shift and work location preferences, the Employer shall notify employees of any imminent changes which might affect employee selections.

The job location and shift selection will be considered the employee's basic job for the duration of this Agreement. In the event that part of an operation within a department is discontinued, employees affected will be allowed to select, in accordance with their seniority, available shifts and locations within the department in their classifications.

## H. INVOLUNTARY TRANSFERS:

In situations where it is necessary to transfer one or more employees from their present job location or shift to another location or shift in the department, such transfers shall first be offered to employees in order of their seniority. When there are not enough volunteers, the transfer shall be made according to inverse seniority. Transfers under this provision shall not affect any transfer requests filed under Section B of this Article.

## I. OTHER TRANSFERS:

The City agrees that in any transfer of work involving employees covered by this Agreement, the City will discuss the transfers with the Michigan Council 25 and the Local Unions affected in order to protect the seniority and equity of the employees involved.

**Note 1:** In the past, the Supplemental Agreements for Locals 214 and 312 have established limitations on seniority for Department of Transportation administrative purposes, such as transfer and promotions, when members of other locals covered by this Agreement have transferred or entered into Locals 214 and 312. Should these limitations be continued in the Supplemental Agreements, these same limitations will be equally applied to members of Locals 214 and 312 when they transfer or enter into other locals covered by this Agreement.

Should any alleged error in the application of this provision be brought by the Union to the attention of the Employer, the Employer shall have seven (7) working days to investigate and make any necessary adjustment before incurring any liability.

**Note 2:** Standard application and request forms for purposes provided in this Article shall be developed and implemented by the Employer after discussing with the Union.

# 19. CONTRACTUAL WORK

A. The City is genuinely interested in maintaining maximum employment for all seniority employees covered by this Agreement, consistent with the needs of the City. Therefore, in making these determinations the City intends always to keep the interest of the City's employees in mind.

B. The right of contracting or subcontracting is vested in the City. The right to contract or subcontract shall not be used for the purpose or intention of undermining the Union nor to discriminate against any of its members nor shall any seniority employee be laid off or demoted or caused to suffer a reduction in overtime work as a direct and immediate result of work performed by an outside contractor.

C. In cases of contracting or subcontracting, including renewal of contracts, affecting employees covered by this Agreement, the City will hold advance discussion with the Union prior to letting the contract. The Union representatives will be advised of the nature, scope and approximate days of work to be performed and the reasons (equipment, manpower, etc.) why the City is contemplating contracting out the work.

# 20. VETERANS-RESERVES-EDUCATION

Nothing in this Agreement shall abridge the rights and preferences of veterans and members of the armed forces reserves, as provided by Federal, State, and Local Laws, Rules and Resolutions.

# 21. MAINTENANCE OF CONDITIONS

Wages, hours, conditions of employment and current proper practices which are beneficial to the employees at the execution of this Agreement, shall, except as provided and improved herein, be maintained during the term of this Agreement. Changes must be mutually agreed upon by the City and the Union.

**Note:** During the course of negotiations there was considerable discussion as to the interpretation and intent of Article 21. The parties agree that Article 21 is intended to include those proper practices and minor benefits not covered by specific language in the Contract. The parties agree that Article 21 is not intended to conflict with the City's ability and responsibility to manage its affairs.

The parties further agree that Article 21 is not intended to maintain improper practices which may exist in the various operating departments nor is it intended to prevent the City from taking appropriate corrective action.

# 22. LEAVES OF ABSENCE

A. **FAMILY AND MEDICAL LEAVE ACT OF 1993 (FMLA):** The FMLA became applicable to employees in the bargaining unit on August 5, 1994. The Human Resources Department issued a Policy Directive dated September 9, 1993, which detailed how the provisions of the FMLA would be implemented in City service. This Policy was re-issued on April 21, 1998. The Policy is incorporated herein by reference.

The FMLA provides that eligible employees may be off work for up to twelve (12) weeks each twelve (12) month period for the following reasons: to get treatment for the employee's own serious illness or temporary disability; to take care of a spouse, child or parent who is seriously ill or disabled; or to exercise parental care for a new-born infant or newly placed adopted or foster child. During this absence from work, the employee is entitled to continuation of health care benefit coverage. For employees of the City, the twelve month period is the fiscal year. Questions concerning leaves for FMLA purposes should be referred to the employee's Human Resources representative.

B. **CITY LEAVES OF ABSENCES:** Leaves for purposes covered under the FMLA may be extended, and leaves for other purposes may be granted, under the City's leave of absence policies and procedures as set forth below:

1. Leaves of absence without pay may be granted for reasonable periods for the following purposes:

   a. Temporary physical or mental incapacity.
   b. Training related to an employee's regular duties in an approved educational institution.
   c. Peace Corps term.
   d. Military service.

2. Leaves of absence may be granted for other reasons than those listed above where in the judgment of the City such leaves are deemed beneficial to the City. Such leaves granted, may be extended for periods up to four (4) years. Seniority of persons on leave of absence shall be governed by the seniority provisions of this Agreement.

3. Approved absences from work without pay for up to thirty (30) continuous calendar days, but not to exceed a total of thirty (30) scheduled work days in any twelve (12) month period, may be granted by the department director. Leaves of absence for more than thirty (30) continuous calendar days must be approved by the Human Resources Director. Unless otherwise provided for in this Agreement, the procedure for the administration of leaves of absence shall be in accordance with Human Resources Department Rules as adopted by the Civil Service Commission in effect on July 1, 1998 ("July 1, 1986 Edition").

4. To be eligible for a leave of absence in excess of thirty (30) continuous calendar days, the employee must have completed one (1) year of continuous classified service immediately prior to the leave. This requirement shall not apply to leaves for military service. Persons unable to work for health reasons and ineligible for a leave of absence, may request a voluntary lay off. If approved, the person's name will be placed on the preferred eligible list for future reemployment when able to return to work.

5. **Parenting Leaves:** A parent of a new-born or newly-adopted infant who is eligible for a leave of absence may request a personal leave without pay for purposes of providing parental care or making child care arrangements. Such absence from work shall not exceed a maximum period of six (6) months including any optional use of accrued vacation or other earned time.

   In the case of employees who have been off work on sick leave or health leave of absence due to maternity, the optional leave for parenting purposes shall not begin until after the employee has been adjudged physically able to return to work.

6. **Leaves for Union Business:** Members of the Union elected or selected by the Union to do work which takes them from their employment shall, at the written request of the Union, receive leaves of absence for the period of employment with the Union, and upon their return shall be reemployed without any loss of seniority.

   Delegates elected to State and National Union Conventions will be allowed time without loss of pay to attend such conventions in the ratio of one (1) delegate per Local.

7. **Health Leaves for Maternity:** Upon presentation of adequate medical documentation that the pregnant employee is no longer able to perform her job duties, a health leave of absence will be granted if the employee has at least one (1) year of continuous classified service. If the employee has less than one (1) year of continuous classified service, the employee may be granted a voluntary layoff (see paragraph 4 above). Prior to going on the unpaid health leave, the employee would have the option of utilizing any accrued vacation days or compensatory time after usage of accrued paid sick leave.

8. **Other Personal Leaves:** In addition to parenting leaves, leaves of absence for other reasons of a personal nature (e.g. caring for an ill relative) may be granted if recommended by the department head and approved by the Human Resources Director. The maximum duration of such leaves shall be six (6) months.

9. When an employee requests a leave of absence in accordance with this Article, the Employer shall inform the employee in writing of the Leave of Absence Rule of the Human Resources Department and the procedure necessary to be followed in order to protect his/her rights and benefits during and following the period of the leave.

   Local Union Presidents shall receive copies of all City rules, directives and policies which pertain to procedures and administration of leaves of absence.

C. **FOLLOWING ARE PROCEDURES AND REGULATIONS GOVERNING CITY LEAVES OF ABSENCE:**

   1. **Procedure for Applying for Leave of Absence**

      a. An employee requesting a City leave of absence shall make written request to his/her department director stating the reasons for the requested leave and providing any necessary documentation. The department director shall investigate such request to determine whether such request is in accordance with departmental policy, and, if approval is recommended, shall submit the leave request on prescribed forms to the Human Resources Director for consideration.

      b. Upon receipt of the recommended leave request, the Human Resources Director shall make such investigation and may require such additional evidence to permit a determination as to whether the request for leave is consistent with City Policy and is in the interests of City service. The employing department director shall be informed of the approval or rejection of the leave request.

      All requests for leaves of absence shall be submitted in sufficient time to enable an adequate investigation to be made prior to the requested effective date of the leave. Failure to provide adequate notice may be grounds for denial of a leave request.

    c.    Requests for extensions of leaves of absence shall be made and processed in the same manner as original leave requests.

    d.    Misrepresentation as to the purpose of the leave of absence shall be grounds for cancellation of the leave and may result in appropriate disciplinary action.

2. **Length of Leaves of Absence:**

    a.    Generally, City leaves of absence shall be initially granted for the period requested by the employee and/or as recommended for approval by the employee's employing department, but not to exceed one (1) year. Exceptions to this general proposition are as follows:

        (1)    Approved leaves of absence for health reasons shall be granted for an initial period not to exceed four (4) months. (Four [4] months is the period of time during which an employee on leave for any reason may continue to be covered by the Employee Benefit Plan. Beyond four months only employees on leave for health reasons may continue to be covered under such plan. If an extension of the leave for health reasons is granted, the employee shall be eligible to participate in the Employee Benefit Plan for the duration of the health leave extension. Such participation is at the employee's own expense.)

        (2)    Approved leaves of absence for military service shall be granted for the entire period required to complete the tour of duty, not to exceed four (4) years plus one (1) additional year resulting from the request of the United States government.

    b.    Extensions beyond the initial period of leave may be granted if necessary to carry out the purpose for which the leave of absence was granted.

    c.    Upon written request of the employee on leave and for proper reasons shown, the employing department director may modify the term of the approved leave to allow for the employee's early return to active employment. Notice of such action shall be promptly given to the Human Resources Department.

3. **Return to City Employment:**

    a.    Upon expiration of the approved leave of absence, the employee has the right to return to a position in the department from which the leave was granted which is in the same classification and at the same salary level which the employee had at the time the leave was approved. If the employee would have been laid off or demoted as a result of a reduction in force in the department during the period of leave, then the employee shall be granted whatever rights the employee would have had had he/she been employed at the time of the reduction in force.

    b.    An employee reporting for reemployment following a leave of absence must be physically and mentally capable of performing the essential duties of the classification for which he/she seeks reemployment. Persons returning after all leaves of absence for health reasons and all leaves of ninety (90) or more calendar days shall be directed to an approved medical facility prior to returning to work. An employing department may also request that a returning employee be referred to the medical facility prior to returning to work in other instances not covered above. Such request shall be in writing.

c. **Special Provisions Applicable to Persons Returning from Military Service:** Employees returning from a leave for military service, upon fulfilling all statutory conditions for reemployment, shall be entitled to all rights and benefits provided under the U.S. Veterans' Reemployment Rights Status (Chapter 43, Part III, Title 38, U.S. Code). Included is the right to be restored to the employee's pre-service position within a reasonable period (not to exceed fifteen [15] days) and to receive all benefits and considerations which the employee would have received or would have been entitled to had the employee remained on the job during the period of military service. Any questions concerning rights of persons returning from military service or claims for benefits under the Veterans' Reemployment Rights Statute should be promptly referred to the Human Resources Department.

4. **Restrictions on Employees on Leave of Absence:**

   a. No person while on leave of absence may be remuneratively employed except where such remuneration is provided for in the purposes for which the leave is granted, or is a necessary component of an approved educational internship.

   b. Commission of any act or conduct which violates the terms of the leave or which would have resulted in suspension or discharge of the person were he/she on the active payroll shall be grounds for cancellation of the leave and may result in appropriate disciplinary action.

# 23. FUNERAL LEAVE

A. If a death occurs among members of the employee's immediate family or household, the employee, provided he/she attends the funeral, will be granted three (3) days leave not to be charged to sick leave; provided that such leave will be extended to five (5) days if the funeral which the employee attends is more than 300 miles from the City of Detroit. When an employee is entitled to three (3) days leave under this provision, and the funeral is within 300 miles of Detroit, he/she shall be granted two (2) days to be charged against current sick leave and then reserve sick leave upon his/her request.

B. **DEFINITION OF IMMEDIATE FAMILY:** The immediate family is defined as wife, husband, son, daughter, brother, sister, father, mother, step-father, and step-mother, step-son and step-daughter.

C. If a death occurs among the relatives of the employee, the employee will be granted one (1) day leave, not to be charged to sick leave provided he/she attends the funeral. If the funeral which the employee attends is more than 300 miles from the City of Detroit, the employee may extend the leave by two (2) days to be charged against current sick leave and then reserve sick leave upon his/her request.

D. **DEFINITION OF RELATIVES:** Relatives are defined as grandson, granddaughter, grandmother, grandfather, brother-in-law, sister-in-law, uncle, aunt, mother-in-law, and father-in-law.

E.   If the Local Union President is not available to attend the funeral of a City employee who is a member of his/her local, a representative of the local, with proper notification to the department head, shall be allowed one (1) funeral day, not to be charged to sick leave, to attend the funeral.

## 24. SICK LEAVE

A.   All employees who shall have completed three (3) months of continuous service shall be granted one (1) day of sick leave for every service month in which they have worked 80% of their scheduled hours, not to exceed twelve (12) sick leave days in any one fiscal year. Sick leave earned after July 1, 1971 may accumulate without limitation. These days shall be known as current sick leave and shall be kept in the Current Sick Leave Bank.

All employees must be on the payroll for the entire month to be credited with sick leave.

B.   Reserve sick leave of five (5) service days shall be granted on July 1st to each employee who was on the payroll the preceding July 1st and who has earned at least sixteen hundred (1600) hours of straight time pay during the fiscal year. Reserve sick leave shall be kept in the Reserve Sick Leave Bank.

C.   Sick leave may not be granted in anticipation of future service.

D.   Sick leave balances shall be expressed in terms of hours and shall be posted on the employee's check stub.

E.   **QUALIFIERS FOR BONUS VACATION DAYS:**

1.   **Fifty Day Qualifier:**  Employees who have accumulated a total of fifty (50) or more unused sick days on July 1 shall receive up to six (6) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

| Total Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days To Be Credited on July 1st |
|---|---|
| 0 | 6 |
| ½ or 1 day | 5½ |
| 1½ or 2 | 5 |
| 2½ or 3 | 4½ |
| 3½ or 4 | 4 |
| 4½ or 5 | 3½ |
| 5½ or 6 | 3 |
| 6½ or 7 | 2½ |
| 7½ or 8 | 2 |
| 8½ or 9 | 1½ |
| 9½ or 10 | 1 |
| 10½ or 11 | ½ |
| 11½ or more | 0 |

2. **Twenty-Five Day Qualifier:** Employees who have accumulated a total of at least twenty-five (25) but less than fifty (50) or more unused sick days on July 1 shall receive up to three (3) bonus vacation days based upon their sick leave usage in the previous fiscal year. Such time shall be credited according to the following table:

| Total Sick Leave Days Used In Previous Fiscal Year | Bonus Vacation Days To Be Credited on July 1st |
|---|---|
| 0 to 2 days | 3 |
| 2½ or 3 | 2½ |
| 3½ or 4 | 2 |
| 4½ or 5 | 1½ |
| 5½ or 6 | 1 |
| More than 6 | 0 |

This section shall otherwise be in accordance with Chapter 13-5-1 of the Municipal Code.

F. **RESERVE SICK LEAVE USAGE:**

1. Reserve sick leave is not available for usage as Departmental Leave Days or to cover short periods of non-chronic illness. Reserve sick leave can only be used for absences which (a) are the result of a period of hospitalization or, (b) cover a period of sickness resulting from a well-documented history of chronic recurring illness.

2. If an employee is denied use of his/her reserve sick leave, the employee shall be notified of the denial as soon as possible after that determination has been made, but prior to the issuance of the affected pay check.

3. If an employee has requested the use of his or her reserve sick leave and his or her Department Director denies such use because it is deemed not to comport with the reserve sick leave usage rule set forth in the preceding paragraph, the denied employee shall be entitled to appeal the matter to the Labor/Management Reserve Sick Leave Review Board (RSLRB). The RSLRB shall consist of a Council 25 Staff representative, the employee's Local Union President, or his or her designee in his or her absence, a representative from the employee's department, and a Labor Relations Division staff member. The Board will consider the appeal of the denied employee and shall have the power to overturn a negative decision of a Department Director. The decision shall be through anonymous voting, with a simple majority deciding the question and with the results being certified as accurate by the initialing by all members of the RSLRB. In the event the board deadlocks "two-to-two" (2-2), the employee's appeal shall be immediately reviewed through the Labor Agreement's Umpire System. In those cases when the employee has won his or her appeal, the employee shall receive his or her reserve sick leave pay generally within the next two (2) subsequent pay check periods.

4. The RSLRB shall meet weekly in conjunction with the Appeal and Review Board. The agenda for the RSLRB shall be comprised of the appeals from the previous week.

G. Employees will have access to Departmental Leave Days in accordance with the Municipal Code and the Manual of Standard Personnel Practices. Permission will not be unreasonably withheld.

H. The above shall be in accordance with Chapter 13, Article 5, Section 2 of the Municipal Code of the City of Detroit except as modified by this Article.

I. The City shall provide upon request monthly reports on sick leave usage by department.

## 25. LONGEVITY PAY

A. Employees shall qualify for longevity pay as follows:

1. Employees may qualify for the first step of longevity pay, provided they have served as City employees for an accumulated period of five (5) years.

2. Employees may qualify for the second step of longevity pay, inclusive of the first step provided they have served as City employees for an accumulated period of eleven (11) years.

3. Employees may qualify for the third step of longevity pay, inclusive of the first and second steps, provided they have served as City employees for an accumulated period of sixteen (16) years.

4. Employees may qualify for the fourth step of longevity pay, inclusive of the first, second and third steps, provided they have served as City employees for an accumulated period of twenty-one (21) years.

5. Employees may qualify for the fifth step of longevity pay, inclusive of the first, second, third and fourth steps, provided they have served as City employees for an accumulated period of twenty-six (26) years.

6. The first step of longevity increment shall be one hundred and fifty dollars ($150). The second step of longevity increment inclusive of the first step, shall be three hundred dollars ($300). The third step of longevity increment, inclusive of the first and second steps, shall be four hundred and fifty dollars ($450). The fourth step of longevity increment, inclusive of the first, second and third steps, shall be six hundred dollars ($600). The fifth step of longevity increment, inclusive of the first, second, third and fourth steps, shall be seven hundred and fifty dollars ($750).

B. Employees who have qualified for longevity pay and have accumulated at least eighteen hundred (1800) hours of straight time regular payroll hours of paid time during the year immediately preceding any December 1 date or other day of payment will qualify for a full longevity payment provided they are on the payroll on the December 1 date or any other date of qualification. Except for employees first qualifying for increments, the payment will be made in a lump sum annually on the first pay date after December 1st.

No employee will be denied a full longevity payment on December 1st because of a temporary unpaid absence of twenty (20) continuous days or less extending through the December 1st date in question.

C. Employees who first qualify for longevity pay increments in any month after any December 1st date shall be paid such increment on a pro-rata basis upon attaining such qualification in the amount of a full increment less one-twelfth (1/12) thereof for each calendar month or fraction thereof from the previous December 1st date to date of such qualification.

D. Prorated longevity payments may be made between December 1 dates to qualified employees and officers who separate or take leave from City service, excluding those who are discharged, those who resign and those who resign with a vested pension. Such prorated longevity increment shall be paid for time served on a full calendar month basis since the date of their last longevity payment; provided, that each month shall contain at least 160 straight time regular payroll hours of service.

E. All of the above provisions except as modified herein shall be in accordance with Chapter 13, Article 7 of the Municipal Code of the City of Detroit.

## 26. WORK WEEK, WORK DAY, SHIFT PREMIUM

### A. STANDARD SERVICE WEEK:

1. The standard payroll work week shall begin at 12:01 a.m. Monday, and end at 12:00 p.m. Sunday. It shall consist of five (5) regularly scheduled eight (8) hour work periods on as many work days. The two (2) remaining days in the payroll work week shall be known as "off days."

2. The first scheduled "off day" within the payroll work week shall be designated as the "sixth day" and the second scheduled "off day" within the payroll work week shall be designated as the "seventh day."

   Off days in the work week shall be scheduled consecutively unless such scheduling shall adversely affect or add cost to operations of the department.

3. The City and the Union will review departmental work schedules which currently do not provide for consecutive off days. If the parties can agree that scheduling changes which allow for consecutive off days are feasible, such changes will be implemented, provided that such changes do not result in increased costs or loss of productivity.

4. The City and the Union will also review those departmental operations which currently require rotating shifts. If the parties can agree that a more productive schedule can be established without an increase in cost, the City will take the steps necessary to implement such schedules.

5. Employees will be allowed to submit shift preferences within locations for any new work schedules established pursuant to reviews made in accordance with Section A-3 and A-4.

### B. SERVICE DAY AND WORK DAY:

1. The regular full working day shall consist of eight (8) hours. It shall begin at 12:01 a.m., and extend to 12:00 p.m.

2. Two (2) coffee breaks of not less than fifteen (15) minutes per shift shall be permitted according to Local Supplemental Agreements.

3. When an employee is called to work, he/she shall be guaranteed no less than four (4) hours of pay for "show up" time at the appropriate rate.

4. The City agrees that a flex-time work schedule may be established in certain departments where the appropriate working conditions exist. The subject of (implementing) flex-time schedules (on a pilot basis) shall be a proper subject for supplemental negotiations with the following stipulations:

   a. Departments shall designate the normal business hours, alternate starting times in thirty (30) minute increments, and staffing levels required to meet its needs.

   b. Employees will be allowed to submit schedule preferences in advance. Upon assignment, the employee will not be permitted to submit a request to change schedules for a period of three (3) months. After three (3) months, if the employee wishes to change schedules, a two (2) week notice must be submitted for consideration.

   c. Should departmental needs change, any new schedules will be discussed with the Local Union President prior to any implementation.

5. Employees of departments or subdivisions thereof which have been authorized by City Council to work regularly less than forty (40) hours but not less than thirty-five (35) in a service week shall be paid on the basis of forty (40) hours with such compensation to be full pay for work up to and including forty (40) hours exclusive of the meal period. Overtime computation shall be in accordance with Article 27-B of the contract. The provisions of this paragraph shall not apply to any additional operations during the term of this Agreement.

6. The City agrees to shorten the work day on Saturdays, Sundays, and holidays for employees assigned to seven-day operations by including the lunch break as part of the work day. This privilege shall be limited to situations where no additional cost or lapse of service will be incurred by the shortening of the work day. Where this privilege is granted no overtime or compensation for more than eight (8) hours shall be paid until an employee actually works more than eight (8) hours.

7. Employees assigned to seven day operations shall be required to call in two (2) hours prior to the start of their shift when requesting a sick day.

## C. AFTERNOON AND NIGHT SHIFTS:

1. **Shift Premium Rates:** Effective July 21, 2003, employees who work regularly scheduled afternoon and night shifts shall receive, in addition to their regular pay, a premium of seventy (70¢) per hour for the afternoon shift and a premium of seventy-five cents (75¢) per hour for the night shift according to Chapter 13, Article 2, Section 12 of the Municipal Code of the City of Detroit.

2. **Shift Premium Times:** The afternoon shift shall be any full-time shift commencing at the hour of 11:00 a.m. or between the hours of 11:00 a.m. and 6:59 p.m.

   The night shift shall be any full-time shift commencing at the hour of 7:00 p.m. or between the hours of 7:00 p.m. and 3:59 a.m. in accordance with Chapter 13, Article 2, Section 12, of the Municipal Code of the City of Detroit.

D. Unless provided for otherwise within this labor agreement, all of the provisions of this Article shall be in accordance with Chapter 13, Article 2 of the Municipal Code of the City of Detroit.

E. All hourly paid employees shall receive their pay for regularly scheduled hours not later than Friday following the payroll week in which it is worked.

# 27. OVERTIME

A. The City has the right to schedule overtime work as required in a manner most advantageous to the City and consistent with requirements of municipal employment and the public interest. Such overtime shall not be scheduled so as to reduce the work force.

Overtime work shall be on a voluntary basis starting with the senior employee as determined in the supplemental agreement. When there are not enough volunteers, overtime assignments shall be made according to inverse seniority. The voluntary overtime rule shall not apply where an unexpected emergency arises or it is impractical to seek volunteers. The voluntary overtime rule, the exceptions thereto and equalization of overtime shall be a subject for supplemental agreements. In the absence of a supplemental agreement, existing departmental practices will apply.

B. **TIME AND ONE-HALF OVERTIME:**

   1. **Hourly Rated Employees** - Time and one-half (one-hundred and fifty per cent (150%) of the basic or hourly rate) will be paid to hourly-rated employees as follows:

      a. All hours worked over eight (8) in one (1) service day except if such time is worked on a seventh day or a holiday.

      b. All hours worked over forty (40) in one (1) service week except if such time is worked on a seventh day or a holiday. Overtime hours worked (not to be credited at premium time) in excess of four (4) hours and not exceeding sixteen (16) hours in one (1) service week may be substituted in lieu of an equal amount of an employee's regularly assigned forty (40) hours.

      c. All hours worked on shifts starting within eight (8) hours of the quitting time of an employee's previous shift, except for those hours worked on a seventh day or holiday.

   2. **Salary Rated Employees** - Time and one-half shall be credited or paid to salary employees as follows:

      a. All hours worked over eight (8) in one service day except if such time is worked on a seventh day or holiday.

b. All hours worked over forty (40) in one service week except as indicated in Section 27, B-2, C and except if such time is worked on a seventh day or a holiday.

   c. Employees who are assigned to a work week of less than forty (40) hours shall be entitled to time and one-half for all work on the sixth day if they shall have worked the assigned hours in the work week.

C. **DOUBLE TIME OVERTIME:**

   1. Double time (two-hundred percent (200%) of the basic or hourly rate) will be paid to hourly-rated and salary-rated employees for work on the seventh day of the work week schedules as defined by Chapter 13, Article 2, Section 12 of the Municipal Code of the City of Detroit.

   2. Effective July 21, 2003, double time (two-hundred percent [200%] of the basic or hourly rate) shall be paid for all time worked in excess of sixteen (16) hours from the employee's assigned starting time.

D. When a schedule indicates a lunch period but conditions make it impractical to enjoy same, the employee or employees involved will be paid the prevailing overtime rate in lieu of his/her lunch period. The provisions of this section shall not apply to employees whose work day is designated on a measured task basis. In no instance shall payments be made for lunch periods not worked.

E. Premium payments shall not be duplicated for the same hours worked.

F. All time paid under this contract and existing rules and ordinances for sick leave, holidays, vacation, jury duty time and time lost due to a job connected injury shall be counted as time worked for the purpose of computing overtime.

G. Except for any contrary provisions above, all of the above shall be in accordance with Chapter 13, Article 2 of the Municipal Code of the City of Detroit and the Michigan Minimum Wage Law.

# 28. HOLIDAYS AND EXCUSED TIME OFF

A. Employees shall be entitled to the following seven (7) holidays: New Year's Day, Martin Luther King's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

   Employees shall be entitled to three (3) swing holidays in each fiscal year. New employees shall be entitled to the first swing holiday after ninety (90) calendar days and the second swing holiday after one hundred eighty (180) calendar days and the third swing holiday after two hundred seventy (270) calendar days.

B. Employees shall receive eight (8) hours straight time pay for the above mentioned holidays. Where a holiday is concurrent with the employee's sixth or seventh work day, the Department

Head shall have the option of paying for the holiday or granting equivalent time off with pay. When the City elects to give the employee time off, said time shall be granted at the request of the employee with the approval of the Department Head.

C.  An employee shall be eligible for holiday pay or excused time day pay provided he/she shall have received at least eight (8) hours of pay exclusive of overtime in the calendar week prior to, during or after the holiday or excused time day; provided the employee continues on the payroll through the holiday or excused time day in question and would otherwise be qualified for the holiday or excused time day.

   For the purpose of this section, an employee shall be considered off the payroll if he/she is fired, quits, is on a formal leave of absence granted by the Human Resources Department (generally over 30 days), is on workers' compensation, or is laid off. An employee's payroll status not covered by the above shall be subject to a Special Conference. Criteria to be used to determine payroll status will be if the absence of the employee shall be for more than thirty (30) days.

D.  If an employee is absent without just cause on a holiday or excused time day on which he/she is scheduled to work, he/she shall receive no pay for the holiday.

E.  Double time will be paid for all hours worked on a holiday in addition to the straight time holiday pay due for a holiday as such.

F.  Premium payments shall not be duplicated for the same hours worked.

G.  Employees shall be granted eight (8) hours of "Excused Time" on Good Friday effective in the year 2004 and thereafter or eight (8) hours on the last scheduled paid day prior to Good Friday, and eight (8) hours of "Excused Time" on the last scheduled paid day before Christmas Day and before New Year's Day and for Veteran's Day, and the day after Thanksgiving, and Election Day as designated by the City Council, or an additional Swing Holiday in the event there is no designated Election Day, provided they are on the payroll through the excused time day in question. Employees required to work any portion of the "Excused Time" on these days will receive either equal time off for hours worked or additional pay at straight time for such hours at the option of the Department Head. No holiday premium will be paid for work on these days. When an employee is absent without good cause for the non-excused portion of the day, he/she shall forfeit this excused time for the day.

H.  For the purpose of this Article, an employee shall be considered off the payroll if he/she engages in a work stoppage which extends through a holiday or excused time day. All benefits under this Article will be forfeited for the holiday or excused time in question.

1.  If a holiday or excused time day falls on Saturday it shall be observed on the preceding Friday, and if a holiday or excused time day falls on Sunday it shall be observed on the following Monday for all employees except those assigned to six and seven day operations. Should two (2) consecutive holidays or excused time days occur on a Friday and Saturday, or on a Sunday and Monday, Friday and Monday, respectively, shall be designated as the official holidays.

J. If an employee engaged in six or seven day operations works either the actual calendar holiday or the substitute holiday, he/she shall receive the holiday premium, but he/she will not be allowed to pyramid holiday premium for working both days.

   1. An employee assigned to a six or seven day operation may be scheduled off for the holiday on either the calendar holiday or the substitute holiday.

   2. When an employee works both the calendar holiday and the substitute holiday, the day selected as a holiday for pay purposes shall be the day which allows the employee the maximum pay credit for working both days.

   3. If an employee works either the calendar holiday or the substitute holiday, but not both, he/she shall be paid holiday premium for the day worked.

   4. If an employee is off sick on the calendar holiday, or the substitute holiday, or both, he/she shall receive holiday pay in lieu of sick pay on one of the two days. If he/she works either of the two days he/she shall receive holiday premium.

   5. If an employee is AWOL on the actual calendar holiday, but works the substitute holiday, he/she shall not be entitled to holiday pay or holiday premium.

K. The City shall have the option to close all or part of its facilities for the Christmas and New Year's holiday season consistent with operating needs and the public service. Employees shall have the option of using vacation, swing holidays, compensatory time or no-pay for any days off during this period. If an employee has none of the above listed accrued time, departmental leave may be used if available. If an employee has no paid time accrued, and wishes to work, the City will make every attempt to place an employee in his/her department on a job assignment consistent with their job classification and ability to perform the work.

In the event a department requires additional personnel during the period, the Human Resources Department will be so advised. Employees who are without accrued time and are desirous of working during the period will contact their department Human Resources Officer for available placement in another department.

The optional holiday season closing dates during the period of this Agreement shall be:

December 26, 27, 28, 2001
December 23, 26, 27, 30, 2002
December 26, 29, 30, 2003 and January 2, 2004
December 28, 29, 30, 2004

The City shall notify the Union by November 1st of each year of whether it intends to implement a holiday closedown.

Any scheduled time off or uses of departmental leave days during these periods shall not be counted against the employees' attendance records nor (except for bonus vacation) adversely affect their benefits.

L. The Holiday Schedule during the term of this Agreement is set forth in Exhibit IV.

# 29. UNUSED SICK LEAVE ON RETIREMENT

A.  Employees shall be entitled to payment for unused sick leave on retirement as follows:

   Upon retirement, or death with twenty (20) years of service, an employee shall be entitled to payment of one-half (½) of their unused sick leave. Effective July 21, 2003, the payment shall be increased to sixty percent (60%) of the employee's unused sick leave.

B.  The payments will be made as part of the Employee's Pension Program, or the Employee's Benefit Plan, or through the Finance Department.

# 30. VACATIONS

A.  **ELIGIBILITY:**

   Employees inducted during the course of the fiscal year shall not be eligible for vacation leave without deduction of pay until they shall have earned at least one thousand (1000) hours of paid time, exclusive of overtime or premium time, and until they have attained status as City employees for at least six (6) months. When employees qualify, as above stated, they shall be entitled to five (5) days of vacation leave. Once employees have earned at least sixteen hundred (1600) hours of paid time, exclusive of overtime, and have attained status as employees for at least twelve (12) months, they are entitled to five (5) additional vacation days. In order that an employee's time may be computed on a fiscal year basis, on the July 1 following his first year anniversary date of employment the employee will be entitled to a prorated vacation leave, computed by multiplying the number of months remaining from the anniversary date, to the end of the fiscal year by 8.3 percent of ten (10) days and rounding the product to the nearest whole number. Thereafter, his vacation shall be computed on a fiscal year basis.

B.  **VACATION SCHEDULE:** The vacation schedule shall be as follows:

   | | |
   |---|---|
   | 0-6 months | No vacation |
   | 6 months | 5 days |
   | 1 year | Additional 5 days |
   | 2 through 5 years | 10 days |
   | 6 years | 11 days |
   | 7 years | 12 days |
   | 8 years | 13 days |
   | 9 years | 14 days |
   | 10 through 12 years | 17 days |
   | 13 years | 18 days |
   | 14 years | 19 days |
   | 15 years or more | 20 days |

C.  **VACATION PERIOD:**

   1.  Vacations will, insofar as possible, be granted at a time most desired by employees according to their seniority and in accordance with local supplemental agreements.

2. When an official holiday occurs during a scheduled vacation, the employee shall be entitled to an additional vacation day.

3. If an employee becomes ill while on his vacation, or prior to, his vacation shall be re-scheduled after proof of such illness.

4. Employees who are on extended sick leave of one (1) month or more on any October 1st date, shall, upon prior written application to the department head and the Finance Director be entitled to a lump sum payment in lieu of time off for all vacation leave earned during the preceding fiscal year.

5. An employee's vacation bank may not exceed more than forty (40) days, or 320 hours, on any October 1.

## D. VACATION PRORATION:

Employees who fail to accumulate the required sixteen hundred (1600) straight time regular payroll hours, those who die and those who are separated from the service, either temporarily or permanently, so that it is apparent at the time of separation that they will not accumulate sixteen hundred (1600) hours of straight time pay, shall be entitled to vacation leave before such separation computed as follows: 8.3 percent of the vacation credit of the previous July 1 multiplied by the number of calendar months in which employees have been paid for not less than one hundred and sixty (160) straight time regular payroll hours, and rounded to the nearest whole number. After sixteen hundred (1600) straight time hours are worked in a fiscal year, employees will be entitled to one hundred percent (100%) of their next July 1 vacation.

Employees who have attained status for at least twelve (12) months but have not yet been placed on a fiscal year basis, and who are separated from the service, shall be entitled to prorated vacation leave, computed by multiplying the number of months worked from the one year anniversary date to the date of separation by 8.3 percent of ten (10) days and rounding the product to the nearest whole day. Current rules governing vacation shall otherwise continue to apply. This paragraph does not apply to part-time, seasonal or temporary employees.

## E. CREDITING VACATION:

One hundred percent (100%) of anticipated annual vacation leave (rounded down to the nearest ½ day) will be posted to an employee's bank after he/she has accumulated sixteen hundred (1600) straight time hours in a fiscal year. In the event an employee has been credited with more time than he/she has earned, on the succeeding July 1st, or date of separation, whichever comes first, the employee will have any vacation time credited but not earned charged first against his/her existing vacation bank, then to his/her swing holiday bank, or failing sufficient time in those two banks, he/she will be docked for the time.

## F. VACATION PRORATION - LAYOFFS:

An employee who is laid off for an extended period of time beyond thirty (30) calendar days, will receive a lump sum bonus payment in lieu of any unused vacation credit including that accrued in the current fiscal year on a pro-rata basis according to Section 30-D.

A recalled employee who received a lump sum bonus credit at the time of layoff for the current fiscal year will have such credit deducted from the total vacation earned in the fiscal year in which he/she is laid off.

An employee who is laid off for thirty (30) days or less shall have the option of receiving a lump sum bonus payment in lieu of vacation or leaving his vacation intact.

## G. RATE DURING VACATION:

Employees will be paid their current base rate while on vacation. Employees with multiple classifications shall be paid an average current rate of pay computed from the ratio of time worked in each classification over the fiscal year immediately preceding such vacation.

## H. ADVANCE CHECKS:

If a regular pay day falls during an employee's vacation of one (1) week or more, he/she may request his/her check in advance before going on vacation and such request shall be granted.

## I. COMPENSATORY TIME CONVERSION:

Employees will have one day of vacation converted to "Prior Compensatory Time" in July of each year. Liquidation will be in accordance with the rules for compensatory time. Employees must liquidate this time by the end of the fiscal year in which it is credited.

# 31. RATES FOR NEW POSITIONS

Rates of pay for newly established classes shall be determined by the Labor Relations Director. Recommendations for the establishment of such rates shall be directed to the City Council. When the new classification clearly falls within one or more established bargaining units covered by this Agreement, Council 25 will be notified in writing as to the classification, the departments, the rate and anticipated number of employees affected before any action will be taken by the City Council. Copies of such notice will be mailed to those Local Unions which will most likely have members under the newly established classification.

In the absence of any appeal by Michigan Council 25 within twenty (20) working days of the date of the notice to the Union, action on the positions will be submitted to the City Council. In the event of an appeal, the interested bargaining agent may negotiate for a suitable rate with the Labor Relations Director and the matter shall be handled in accordance with the procedure for Special Conference. If the parties fail to reach agreement on a new rate within forty-five (45) days after notice is given to the Union, the City may implement its last offer to the Union. The City's offer shall be retroactive to the date of the adoption of the new classification by the Human Resources Department. The City's implementation action shall not terminate the negotiations and any subsequent settlement shall also have retroactivity to the date the Human Resources Department established the new classification. (It is understood that an employee will be eligible for retroactive pay only for such periods of time as the Human Resources Department has determined the employee to have actually been performing the duties of the new classification).

**Note:** See Exhibit I Re: Bargaining Unit Classifications, paragraph F, page 127.

# 32. TEMPORARY ASSIGNMENTS

## A. GENERAL PROVISIONS:

Employees shall be regularly assigned to perform duties commensurate with their job classifications and shall not be assigned work outside of their current classifications except in cases of emergency or temporary absences of other employees, and where reassignment of duties is necessary to effectively carry out departmental operations. Emergency conditions shall be defined as those situations caused by factors beyond the control of management such as acts of God which cannot be anticipated or planned for in the normal course of departmental operations.

## B. OUT-OF-CLASS ASSIGNMENTS:

1. For purposes of this Article, an employee is deemed to be working "out-of-class" if he/she is reassigned by management from his/her regularly assigned duties to perform duties and responsibilities not normally performed and characteristic of and requiring the qualifications of a higher classification. Assignment of some duties normally performed by an absent employee shall not constitute an out-of-class assignment if such duties are appropriate to the classification of the person assigned.

2. If an employee is so assigned the duties of a higher classification to replace an absent employee for two (2) or more consecutive work days and/or a total of four (4) or more days in any calendar month, he/she shall be compensated on an out-of-class basis at the rate for the appropriate classification for all such out-of-class hours worked.

3. For short-term out-of-class assignments in the bargaining unit resulting from absences due to use of sick days, vacation, departmental leave, etc., the most senior pre-qualified employee in the same work unit shall be offered the out-of-class work provided he/she is readily available and able to do the work. Pre-qualified shall mean being on the most recent promotional list for the class. If there is no pre-qualified employee in the work unit, the out-of-class assignment shall be offered to the most senior person in the unit provided he/she is readily available and able to do the work.

4. For long-term out-of-class assignments in the bargaining unit resulting from absences due to extended illness, formal leaves of absence, scheduled future retirements, etc., which are anticipated to extend beyond three (3) months, the most senior pre-qualified employee in the same work unit shall be temporarily promoted for the duration of the regular employee's absence provided he/she is readily available and able to do the work. Pre-qualified shall mean being on the most recent promotional list for the class. If there is no pre-qualified employee in the work unit, the most senior pre-qualified employee in the department will be given consideration for transfer and temporary promotion to the available position provided he/she is readily available and able to do the work and provided it does not adversely affect departmental operations.

   If a disagreement exists with respect to the interpretation of a work unit as it pertains to the above provisions, the parties agree to resolve this issue during supplemental negotiations. If a mutual agreement cannot be reached regarding the application of this Article to a particular department, the matter will be referred back to the City's Labor Relations Division for a resolution.

5. The parties recognize that out-of-class work assignments shall not be used to circumvent established procedures for filling vacant positions by transfer or promotion as provided in Article 18 - Transfers and Promotions, nor shall supervisors avoid out-of-class payment by arbitrarily alternating out-of-class assignments.

6. If the Union or the employee believes that the employee is regularly assigned duties outside of his/her current job classification, the Union or the employee may request the Human Resources Department to conduct a classification survey of the employee's position. The Human Resources Department will endeavor to complete the survey within ninety (90) days of receipt of the employee's classification questionnaire. If this survey cannot be completed within this time period, the Union and/or employee will be notified.

7. Health and Safety issues arising from out-of-class assignments shall be handled in accordance with procedures set forth in Article 13 Health and Safety.

8. Employees assigned to work out-of-class shall receive the appropriate additional compensation promptly not to exceed sixty (60) days after the pay period in which the out-of-class work was performed. This provision shall not apply where there is a dispute as to whether the employee worked out-of-class.

When situations are identified where the above provision has not been complied with, the Labor Relations Division will promptly investigate and take action to expedite payment to employees.

C. **TEMPORARY PLACEMENT OF EMPLOYEES INTO OTHER DUTIES AND/OR DEPARTMENTS:**

1. The employer may temporarily place an employee into other duties/department in another department once per year. The employer shall first seek volunteers and if additional employees are required, the employee(s) may be placed by inverse seniority.

2. Such a temporary placement, if made by inverse seniority, shall be limited to forty-five (45) days. An employee that volunteered for such a temporary placement may continue in the placement beyond the forty-five (45) day limit until such time that the employee or the City requests the placement to be ended.

3. Employees temporarily placed under these provisions shall not be required to perform work out of their class, except that the provisions for out-of-class assignments shall be available for operation in these cases of temporary placement, provided that out-of-class opportunities at the transferred-in location must be preserved and first made as available to any qualified employee regularly assigned at the transferred-in location. Regardless, if the work performed at the transferred-in location is an upgrade, the subject temporarily placed employee shall be paid the out-of-class rate.

4. Employees temporarily placed under these provisions shall not lose his or promotional opportunity at the transferred-out location and shall be treated as if he or she had was not or had not been temporarily placed in other duties/department.

5. The local union(s) at the transferred-out and transferred-in locations shall be notified of the proposed move and the reasons therefore, at least thirty (30) days before the planned placement. The City will consider any union responses to its originally planned placement(s) for the possibility of choosing to modify said plans.

6. Any vacation period the moved employee had approved at the transferred-in location will continue to be honored at the transferred-out location.

# 33. JURY DUTY

A. An employee who serves on jury duty will be paid the difference between his/her pay for jury duty and his/her regular pay for all days he/she is required to serve on jury duty.

B. In the event that an employee reports for jury duty but does not actually serve on a jury, he/she will be paid the difference between the jury pay received and his/her regular days pay and be excused for the day.

C. In order to receive payment for jury duty supplementation, an employee must have been regularly scheduled to work on a non-overtime basis, must give reasonably prompt prior notice to his/her supervisor that he/she has been summoned for jury duty, and must furnish satisfactory evidence that he/she reported for or performed jury duty on the days for which he/she claims such payment, provided that the department head shall have discretion in seeking to have the employee excused where his/her services are essential.

The jury duty supplementation shall not apply to special service, contractual, temporary or other employees with less than one year of seniority.

D. When properly notified by an employee under the terms of Section C, the department shall, if necessary, reschedule the work assignment of the employee so as to coincide as closely as possible with the jury duty schedule. This reassignment shall take precedence over other conflicting sections of this contract (except Article 7-F).

E. Employees shall have the option when called to jury duty to use vacation or compensatory time for such service. In that event, the employee will not be required to turn in his/her jury pay. However, the employee must notify the department of his/her desire to exercise this option prior to the first date of jury service.

F. Jury duty shall be considered as time worked.

G. An employee on jury duty will be continued on the payroll and be paid at his/her straight time hourly rate for his/her normally scheduled hours of work. Upon return from jury duty, the employee shall present evidence of the amount received from such jury duty and return that amount to the City, less any mileage allowance paid for the jury service.

If an employee fails to turn in his/her jury duty payment, the City will hold subsequent payments due to the employee until the City is reimbursed for all time lost due to the alleged jury duty service.

# 34. HOSPITALIZATION, MEDICAL, DENTAL AND OPTICAL CARE INSURANCE

Status quo of existing hospitalization, medical dental and optical care benefits will be maintained while the parties work cooperatively to institute mutually agreeable changes.

A. The City shall continue to provide hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service rate under the Michigan Variable Fee Coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87)[1], known as the two dollar ($2) deductible Drug Rider for employees and their legal dependents, duty disability retirees and their legal dependents, and duty death beneficiaries and their legal dependents, as provided by Chapter 13, Article 8 of the Municipal Code of the City of Detroit.

B. The City's contribution for the cost of hospitalization on a monthly basis shall be as follows:

| Single person | $100.06 |
| Two person | $238.29 |
| Family | $253.54 |

Fifty percent of any premium charges that exceed the above amounts will be paid by the employees and fifty percent shall be paid by the employer. When the City's payroll system has the capability of allowing employees to pay these amount through the pre-tax IRS code 125K mechanism, all bargaining unit members shall be entitled to participate.

C. Employees who wish to insure sponsored dependents shall pay the premium cost of this coverage.

D. The City will pay the premium for regular retirees and their spouses hospitalization and medical insurance based on the Blue Cross/Blue Shield ward service under the Michigan Variable Fee coverage (MVF-2) and the Prescription Drug Group Benefit Certificate with two dollar ($2) co-pay (Certificate #87)[1] known as the two dollar ($2) deductible Drug Rider as provided by City Council in the 1977-78 Closing Resolution. The City will pay this premium for regular retirees and their spouses for only as long as they receive a pension from the City.

For persons who retire (except for vested retirees) on or after July 1, 1986, the City will pay the following amounts per month for hospitalization and medical insurance:

| Single person | $100.06 |
| Two person | $238.29 |

Fifty percent of any increase over these amounts will be paid by the retiree. The City will pay this premium for regular retirees and their spouses only for as long as they receive a pension from the City.

E. The City Blue Cross hospitalization plan for active employees and their dependents shall include Blue Cross Master Medical insurance with a twenty percent (20%) co-pay benefit and a fifty dollar ($50) per person annual deductible ($100 for two or more in a family).

F. Employees and retirees shall have the option of choosing alternative hospitalization medical coverage from any plan or program made available by the City. The City's contribution to the alternative plans or programs shall be limited to the premium cost for the level of benefits provided in Paragraphs B and D, as applicable. If at the end of any fiscal year an alternative hospitalization plan or program has failed to enroll 50 employees city-wide, the City shall have the option of removing that plan from the list of eligible plans or programs. Effective with the 1987-88 fiscal year, all alternate carriers must account for their premium charges without distinguishing between active and retired employees using the following format:

**Single Person**
**Two Persons**
**Family**

G. The City shall provide for all active employees and their dependents, and duty disability retirees and their dependents, a Dental Plan which shall be the Blue Cross/Blue Shield program which provides Class I benefits on a 25% co-pay basis and Class II and III benefits on a 50% co-pay basis. Classes I, II, and III benefits shall not exceed $1,000 per person per year. In addition, Orthodontic coverage shall be on a 50% co-pay basis with a $1,000 life time maximum. Other terms and conditions regarding these plans shall be in accordance with the standard Blue Cross/Blue Shield policies regarding administration of such programs.

The City, in mutual agreement with the Union and the Health Care Cost Reductions Committee (HCCRC), will make available cost effective alternative dental plans.

Newly hired employees shall not be eligible for these benefits until they shall have worked 1,040 straight time hours.

H. The City will provide Optical Care Insurance through the Employee Benefit Board according to the schedule of benefits outlined in Exhibit II. Effective July 1, 1999 through June 30, 2001, the City will contribute $5.50 per month for employees covered by CO/OP Optical and $5.43 per month for employees covered by Heritage Optical.

Optical care enrollments will occur at two (2) year intervals.

I. If, during the term of this Agreement, a Federal Health Security Act (National Health Insurance) is enacted, the parties agree to reopen discussions with respect to health care benefits if there is need to do so due to the impact of such a Federal program.

J. No insurance carrier shall be allowed to underwrite City Health Care Benefits unless it offers coordination of benefits. All carriers will be required to provide group specific utilization and cost data as a condition of doing business with the City. Copies of all information will be provided to Union and City representatives as directed.

K. The parties agree to form a Health Care Cost Containment Committee made up of an equal number of members from the City and the Union which will review and agree to further cost containment programs to cover both active employees and future retirees during the term of the Contract. Said cost containment programs shall not diminish the levels of benefits provided in the basic plans but may require the insured to follow procedures prescribed by the carrier in order to be eligible for benefits. If premium levels remain below the amounts listed in the 1982-

83 base premium levels for insurance listed in paragraph "B", the City will pay fifty percent (50%) of that amount to an escrow account which shall be used to offset health care costs or increase health care benefits.

Furthermore, the parties agree during the term of this Agreement to continue to discuss the City's hospitalization plans. The parties are committed to investigate programs which will reduce costs and bring about a corresponding reduction in premium sharing by employees. Programs to be considered would include alternative health care providers, additional cost containment programs, and alternative traditional plans. Any programs agreed to by the parties will be implemented during the term of this Agreement.

L. **HOSPITALIZATION-MEDICAL COVERAGE OPT-OUT PROGRAM:** Effective July 1, 1999, employees on the active payroll who are covered by a health care plan offered by an employer other than the City, and can furnish proof of such coverage, may elect to take an annual $950 cash payment, which will be paid in four (4) equal installments ($237.50) at the end of each three (3) month period, in lieu of the hospitalization-medical coverage offered by the City. This election shall take place annually during the open enrollment period.

Once an employee elects the cash payment, the employee will not receive hospitalization-medical coverage until the next year's enrollment period. If the employee loses his eligibility for the alternate coverage, the employee, upon submitting appropriate proof of loss of coverage, will be able to resume the City's hospitalization-medical coverage the month following completion of the applicable enrollment forms. The cash payments will cease upon the employee resuming the City's hospitalization-medical coverage.

The City shall have the sole discretion to offer this opt-out provision to current and future retirees who are eligible for the City's hospitalization-medical coverage. This discretion shall extend to the determination of the amount of the cash payment, the method of payment, the eligibility requirements, and the continuance of the opt-out plan itself.

**Note:** A description of the City's health care, optical and dental plans appear in Exhibit II.

---

[1] The $2 deductible Drug Rider (Certificate #87 as referenced above, reflects the benefit at the time the premium sharing arrangement was instituted. Currently, the co-pay for the Prescription Drug benefit is $3. Retirees shall be responsible for the co-pay amount in effect at the time of retirement.

# 35. WORKERS' COMPENSATION

A. All employees shall be covered by the applicable Workers' Compensation laws and related benefits. An employee sustaining injury or occupational disease arising out of and in the course of City employment shall be continued on the payroll and his/her time shall be charged to his/her sick leave reserve for all days not covered by Workers' Compensation payments; provided that in the absence of any sick leave reserve he/she shall be paid regular wages or salary to the extent of two-thirds of his/her daily wage or salary but for a period not to exceed seven (7) days; provided also that where the employee has off-time banks and receives income under the Worker's Compensation Act, such income shall be supplemented by the City from his/her off-time banks in an amount sufficient to bring it up to ninety-five percent (95%) of his/her weekly take-home pay. For the purposes of this Article, take-home pay is defined as gross pay from the City less Social Security deductions, and less Federal, State and City income

tax withholding amounts based on the employee's actual number of dependents. Employees shall be eligible to earn current sick leave.

B. Employees who are unable to supplement their Workers' Compensation benefit from their off-time banks because the amount of overtime worked causes the benefit to meet or exceed ninety-five (95%) percent of weekly take-home pay, shall be treated like employees who are able to supplement for the purposes of hospitalization, life insurance and current sick leave. This provision does not apply to those employees who are unable to supplement because they have no time available in their off-time banks.

C. Employees shall not be eligible for holiday pay nor earn additional vacation or reserve sick leave when they are being paid Workers' Compensation benefits.

D. The City agrees to continue hospitalization and life insurance benefits for employees with one (1) or more years of seniority who have been approved for Workers' Compensation benefits for a period of nine (9) months after they go off the payroll. Thereafter employees will be entitled to benefits which accrue to them through the Pension Plan and the Income Protection Plan.

   Note: In order to continue hospitalization and life insurance benefits, employees are responsible for their portion of the premium as required by the Contract. Those deductions will be made automatically while they remain on the payroll because they are supplementing. Once they leave the payroll, they must make arrangements with the Pension Bureau to pay those premiums in order to continue coverage.

E. Consistent with the Workers Compensation Act and current City practices:

   1. The City shall continue its program of returning workers who suffered job injuries back to active employment to perform work tasks which are compatible with their current physical capabilities. To the maximum extent possible, employees will be returned to their former job classification in their former department, or if no such position is available, in another City department if they are presently able to perform the essential duties with or without reasonable accommodations.

   2. If the employee is presently able to perform some but not all of the essential duties, but there is competent medical documentation that he/she will be able to perform all such duties within ninety (90) days, he/she may be placed conditionally in an available position in the classification subject to review at the end of this period. Work tasks assigned will be those compatible with present work restrictions.

   3. If the employee cannot presently be returned to his/her former job classification, he/she will be placed in an appropriate available position in another classification on a temporary basis until such time as the employee is able to return to his/her former job classification or acquires permanent status in the alternate classification by action of the Human Resources Department. The duration of the temporary status shall be in accordance with the Workers' Compensation Act. During the temporary period, efforts will be made to place the employee in available positions consistent with his/her training and experience and current physical capabilities.

4. While employed in the alternate job classification, whether temporary or permanent, the employee shall be represented by the local union having jurisdiction over employees in that classification and at that location. However, residual seniority rights to the employee's former classification shall remain with his/her former local or other union. An employee in an alternate classification on a permanent basis continues to have a right to return to his former job classification in his former department when physically able to do so.

5. Employees returned to work under these provisions shall not be charged with absences for disciplinary purposes where there is medical documentation that such absences were caused and necessitated by the former job injury.

6. Employees will be eligible for wage increases granted to their alternate job classification.

7. Should a medical dispute arise between the employee's physician and the Employer's physician, a third physician will be mutually selected by the doctors and the third doctor's opinion shall be final and binding on the City and Union.

F. **JOINT LABOR/MANAGEMENT REVIEW COMMITTEE:**

A joint committee of three representatives of the union and three representative of management shall be established to review all situations involving the return of employees to active employment from job injury. The committee shall meet periodically at mutually agreeable time and places or upon request to discuss problems associated with the return to work program.

**Note:** This matter may also be referred to the Central Labor/Management Committee by mutual agreement of the parties, (see Memorandum of Understanding, page 93).

# 36. DEATH BENEFITS AND LIFE INSURANCE

A. **DEATH BENEFITS:**

Death benefits for all regular City employees are authorized by the City Charter, Title IX, Chapter VIII. The City Code, Chapter 13, Article 8, Section 8, currently provides a death benefit of $10,000.

1. **Membership:**
   Mandatory for regular employees.

2. **Contributions:**
   By the City - $13.30 per year per employee.
   By the employee 20¢ per week or $10.40 per year.

If during the term of this Agreement, the Employee Benefit Board approves an increase in the death benefit eligible for payment to members of the plan, the parties agree that this increased benefit will be applicable to employees covered by this Agreement.

B. **PAYMENT FOR EMPLOYEES KILLED OR PERMANENTLY DISABLED IN LINE OF DUTY:**

1. A lump sum duty death benefit of $10,000 will be paid to the beneficiaries or estate of employees who are killed or who die as a direct result of injuries sustained in the actual performance of their duties.

2. A lump sum payment of $10,000 will be made to any employee who is totally and permanently disabled from illness or injury arising solely out of the actual performance of their duties. "Totally and permanently disabled" shall be defined exclusively as follows:

   a. Total and permanent loss of sight of both eyes.
   b. Loss of both legs or both feet at/or above the ankle.
   c. Loss of both arms or both hands at/or above the wrist.
   d. Loss of any two of the members or facilities enumerated in (a), (b), (c).
   e. Permanent and complete paralysis of both legs or both arms or one leg and one arm.
   f. Incurable insanity or imbecility.

   A claimant to benefits under this Paragraph shall have the right to present any written information in support of the claim which shall become part of the records reviewed by the physician appointed by the Finance Director and the Medical Board of Inquiry, should a Board of Inquiry be formed.

   The Finance Director shall appoint a physician who shall examine the medical records and findings and with respect to rights of claimants, the physician may also personally examine the claimant. Said physician shall within sixty (60) days of appointment file a written report regarding his medical findings, which report shall include a recommendation as to whether or not the claimant is entitled to the benefits.

   Should either the claimant or the Finance Director disagree with the medical findings of the physician so appointed and the claim for benefits is denied, the claimant or the Finance Director must so indicate to the other in writing the demand for a Medical Board of Inquiry.

   The Medical Board of Inquiry shall consist of three physicians or surgeons appointed by the Wayne County Medical Society. The Medical Board of Inquiry shall examine all medical findings and within sixty (60) days of its formation shall file with the Finance Director a written report of its findings, which as to the benefits provided herein shall be final and binding as to the medical finding. The Finance Director shall pay the fees of the physician named by him and the fees of any Medical Board of Inquiry formed.

3. Employees who receive a permanent disability payment under this Article shall be ineligible for the $10,000 Duty Death Benefit described in Section B-1 above.

C. **GROUP LIFE INSURANCE:**

A group life insurance program for the employee and his/her family is available for all members of the Employees Benefit Plan on an optional basis, under the provisions of the City Code, Chapter 13, Article 9.

1. **Membership:** Optional for members of the Employees Benefit Plan.

2. **Contributions:** The City shall pay approximately sixty percent (60%) of the premium for insurance up to and including $12,500. The employee shall pay forty percent (40%) of the premium for insurance up to and including $12,500. The employee shall pay the full cost of any insurance in excess of $12,500.

3. **Benefits - Employees:**

| Yearly Pay | Amount of Insurance |
|---|---|
| Under $5,000 | $ 3,750 |
| $5,000 to $7,500 | $ 6,250 |
| $7,000 to $10,000 | $ 9,375 |
| Over $10,000 | $12,500 |

4. **Benefits - Dependents:**

| Cost to Employee | Amount of Insurance |
|---|---|
| $.70 per week | $5,000 each dependent |

## D. ADDITIONAL INSURANCE:

1. Employees will be able to purchase insurance which is approximately equal to their annual salary or they may choose to purchase insurance which is approximately equal to two times their annual salaries in accordance with the following:

| Yearly Pay | Amount of Insurance Option 1 | Amount of Insurance Option 2 |
|---|---|---|
| $12,500 to $15,000 | $15,000 | $30,000 |
| $15,000 to $17,500 | $17,500 | $35,000 |
| $17,500 to $20,000 | $20,000 | $40,000 |
| $20,000 to $22,500 | $22,500 | $45,000 |
| $22,500 to $25,000 | $25,000 | $50,000 |
| $25,000 to $27,500 | $27,500 | $55,000 |
| $27,500 to $30,000 | $30,000 | $60,000 |
| $30,000 to $32,500 | $32,500 | $65,000 |
| $32,500 and above | $35,000 | $70,000 |
| and so forth in | and so forth in | and so forth in |
| $2,500 increments | $2,500 increments | $5,000 increments |

2. Subject to the agreement of and conditions determined by the current life insurance carrier, retirees shall have the option of converting all or part of their group life insurance to a life insurance policy at their own expense. Also, subject to the above conditions, employees who resign may continue their current coverage at their own expense. For retirees who elect to retain this coverage, the City shall deduct the premiums from their retirement checks on a monthly basis.

## E. OPTIONAL LIFE INSURANCE:

The City agrees to deduct premiums for whole life insurance coverage for a carrier selected by the Union and approved by the City. A minimum of 400 employees must sign up for the deduction before the plan will be implemented. A charge of fifteen (15) cents per deduction, per employee will be made by the City. The carrier shall pay the City fifteen (15) cents per deduction, per employee.

# 37. UNION BULLETIN BOARD

A. The City will furnish for the Union one (1) adequate bulletin board at each of the agreed locations as provided in the Local Supplemental Agreement. The boards shall be used only for the following notices:

   1. Recreational and social affairs of the Union.
   2. Union meetings.
   3. Union elections.
   4. Reports of the Union.
   5. Rulings or policies of the Michigan Council 25 and International Union.

   Notices and announcements shall not contain anything political or of a libelous nature. All notices shall be signed by the Local Union President or his designated representative.

B. Any abuse of the Union bulletin board will be a matter for a special conference.

# 38. SUPPLEMENTAL AGREEMENTS

A. The parties agree that Supplemental Agreements involving matters not covered herein and peculiar to a specific department shall be attached hereto and made part of the entire agreement.

B. Said Supplemental Agreements must be approved by the parties to this Agreement.

C. The parties agree to attempt to finalize the next Supplemental Agreements by starting negotiations six months prior to the expiration of this Agreement.

# 39. STRIKES AND LOCKOUTS

A. Interference with Work: The Union agrees to refrain from engaging in any strike, work stoppage, slowdown or interference of any kind with the operations of the City during the term of this Agreement.

   The City will not lockout any employee during the term of this Agreement. However, if any employee is unable to work because equipment or facilities are not available due to a strike, work stoppage, slowdown or other interference by other employees, such inability to work shall not be deemed a lockout under the provisions of this section.

B. It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action if any employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of the Union party to this Agreement, except that the City shall not be required to pay the wages of employees who shall refuse to report for and be willing to work on City property. Provided, however, that such refusal shall in no way be detrimental to the public health or safety. However, the employee cannot be ordered to cross a picket line if such action could result in adverse affect of the personal safety of the employee, nor shall employees be required to do work normally done by striking members of other Unions.

C. Any alleged violation of A and B above shall be submitted directly to the Fourth Step of the grievance procedure.

# 40. SAVINGS CLAUSE

If any Article or Section of this Agreement or any Supplement thereto, should be held invalid by operation of Law or by any Tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such Tribunal, the remainder of this Agreement and Supplements shall not be affected thereby, and the parties shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement for such Article or Section.

# 41. WAGES

A. **WAGE INCREASE:**

1. **General Wage Increases:**

   | | | |
   |---|---|---|
   | a. | Effective July 1, 2001 | 0% |
   | b. | Effective July 1, 2002 | 0% |
   | c. | Effective July 1, 2003 | 2% |
   | d. | Effective July 1, 2004 | 2% |

2. **Cash Bonus:**

   Members of the bargaining unit who are on the payroll on the date of the Union's ratification of this Agreement shall receive a $400 cash bonus. This payment will be made as soon as possible following the date of Union ratification and the City Council's resolution approving the economic terms. This payment shall not increase the employee's base rate of pay, nor shall it be included in average final compensation for pension purposes.

   Persons who are on approved leave of absence, workers compensation, long-term disability or other absence from the payroll on the date of ratification shall be eligible for the $400 bonus upon their return to active employment.

3. **Special Wage Adjustments:** See Memorandum of Understanding RE: Classification Changes and Special Wage Adjustments.

B. **MISCELLANEOUS:**

1. All salaried employees will have their hourly rate computed by dividing their annual salary by 2080 hours.

2. Salary and Rate Adjustments:

   a. The pay rates of hourly-rated employees shall be rounded up to the nearest whole cent.

   b. Each employee covered by this Agreement, whose wages are classified as a yearly salary with minimum and maximum rates more than $20,000 annually, and which

rates, as a result of any required change to be made to their wages causes the resulting amounts to fall between even hundred-dollar levels, shall have these rates adjusted to the next higher hundred dollar level.

3.  Step increments shall be automatic.

4.  Step increments for hourly rated employees shall be $.10 per hour.

5.  The hourly rated classifications listed in **Exhibit V** of this Agreement shall receive step increments that will take them from the minimum to the maximum rate in six (6) years.

6.  The annual step increment for salary classifications shall be five percent (5%) of the employee's salary as of the date the increment is normally paid, not to exceed the maximum rate for the classification.

    Half steps shall be two and one-half percent (2 ½%).

7.  Salaried employees shall have their current step codes maintained and any salaried employees who would not reach the maximum of the class within six (6) years will receive a step increment on their last step date which shall place them at the maximum rate for that classification.

8.  Employees promoted from classes where the maximum of the old class is greater than the minimum of the new class, shall be entitled to a step increase of two annual steps not to exceed the maximum of the new class.

9.  Employees benefits for those employees sixty-five (65) years of age and older may be modified as permitted by law but shall not result in any additional cost to the employee.

10. Deferred Compensation Plan: Employees shall be eligible for a Deferred Compensation Plan made available by the City. Participation in the plan shall be optional with each employee.

11. Credit Union Deductions: In the event that Michigan Council 25 organizes a Credit Union, the City will permit payroll deductions in the same manner and form it is now doing for the Detroit Municipal Employees Credit Union.

12. Public Service Credit Union: Following full and complete deployment of all of the applicable DRMS modules, or other computerized payroll processing systems, the City will meet with the labor organization and Public Service Credit Union representatives with the goal of establishing payroll deductions in the same manner and form, or as closely as possible, that it does for the Detroit Municipal Employees Credit Union.

C.  **CORRECTION OF PAYROLL ERRORS:**

Where by payroll error an employee is underpaid or overpaid the City is expressly authorized to correct the underpayment or overpayment by payroll adjustment. The City shall notify an employee in writing fourteen (14) days prior to making any overpayment recovery.

The correction of the underpayment shall be made within 60 days after notification to the department human resources office.

For overpayment recoveries the City is authorized to deduct up to fifty dollars ($50) weekly or one hundred dollars ($100) bi-weekly. If the employee separates from City service, the entire unpaid balance shall be recoverable immediately.

If the amount owed by the employee is over $2,600, the City reserves the right to seek immediate recovery through appropriate legal proceedings.

## 42. CLOTHING AND UNIFORM ALLOWANCES

A. The clothing allowance shall be $85 per year. Effective with any payment made subsequent to July 1, 2003, the clothing allowance shall be increased to $170.

B. For employees who are required to furnish a specific uniform at their own expense, the allowance will be $170 per year. Effective with any payment made subsequent to July 1, 2003, the uniform allowance shall be increased to $350.

C. This Article shall be administered according to the Resolution of the City Council of May 9, 1974 (J.C.C. p. 1107).

## 43. SUCCESSOR CLAUSE

This Agreement shall be binding upon the successors and assignees of the parties hereto, and no provisions, terms or obligations herein contained shall be affected, modified, altered, or changed to the detriment of the other party in any respect whatsoever by the consolidation, merger, sale, transfer, lease, or assignment of either party hereto, or affected, modified, altered, or changed in any respect whatsoever by a change of any kind of the ownership or management of either party hereto of any separable, independent segment of either party hereto.

## 44. EMPLOYEE ASSISTANCE PROGRAM

A. The City and the Union recognize and acknowledge that behavioral-medical problems have an adverse effect on the employee's job performance and merits special attention. Examples of these problems include but are not limited to substance abuse, including alcohol and drugs, physical illness, mental or emotional illness, marital or family maladjustments and other personal problems. These behavior-medical problems impair the employee's ability to function, and contribute to increased absenteeism and tardiness, and violation of other rules, regulations, and procedures. The combination of factors is recognized as having potentially damaging effects on the employee, the work site and the well-being of co-workers. The City and Union believe most behavioral-medical problems are treatable. The Employee Assistance Program is designed to provide assistance to employees who are experiencing behavior-medical problems that may result in deteriorating job performance.

B.  The City and AFSCME believe that constructive measures are possible to deal with the problem through labor/management cooperative efforts. Toward this end, the City and the Union agree to continue to have the Central Committee composed of three (3) representatives of Council 25 of AFSCME and three (3) representatives of the City of Detroit. Central Committee members will be allowed to attend meetings of the Central Committee without loss of time or pay.

C.  It shall be the responsibility of this committee to:

1.  Oversee the establishment of mandatory local employee assistance committees in each department and assist such departmental committees to establish effective programs consistent with the purposes of this Article.

2.  Promote further understanding of this program by establishing guidelines and disseminating program information to employees, supervisors and Union representatives.

D.  In each department, the existing local committees composed of an equal number of union and departmental representatives shall continue to work cooperatively outside the grievance procedure on problems related to employee assistance. The responsibility of the departmental committee will include:

1.  Providing information to and assisting in identifying and motivating employees who may suffer from problems to seek treatment and rehabilitation.

2.  Helping the employee understand and deal with problems by referral to the City of Detroit's Employee Assistance Program. Any such communication, referral or consultation will not be the basis of disciplinary action.

E.  Notwithstanding the establishment of a Central Committee and local committees, nothing prevents the City of Detroit from utilizing different means of providing various assistance services in the future.

F.  The parties agree that to increase effectiveness of Committee discussions, relevant training in specific subject areas should be made available to committee members. Provisions may be made to send selected committee members to seminars, workshops or in-service training.

G.  The City and the Union agree that:

1.  Nothing in this statement is to be interpreted as constituting any waiver of management's responsibility to maintain discipline or the right to invoke progressive disciplinary measures when applicable in the case of misconduct which may result from or be associated with the abuse of any substance or other personal problem; the union may exercise its right to process grievances concerning such matters in accordance with the AFSCME Master Agreement.

2.  During or following treatment, the employee should not expect any special privileges or exemptions from standard personnel practices; however, employees with substance abuse problems or personal problems will be allowed to liquidate sick leave for the purpose of treatment or rehabilitation upon presentation of satisfactory medical evidence.

3. When a leave of absence is necessary so that an employee may undergo behavioral-medical treatment for alcoholism, drug abuse, or other personal problems in or from an appropriate facility in accordance with this program, and when the employee has voluntarily submitted himself for such treatment, he may be granted a leave of absence if the employee has completed one (1) year of continuous classified service immediately prior to the leave.

4. The confidential nature of medical records of affected employees will be preserved in the strictest manner as all other medical records. To the extent feasible, employee assistance facilities will be located in areas separate from other City activities.

## 45. CAREER DEVELOPMENT AND TRAINING

A. The City and the Union recognize the need to provide training and career development opportunities for employees which will develop their skills, knowledge, and abilities to effectively carry out duties and responsibilities of their current classification, and to qualify for more responsible positions in the future.

B. The City subscribes to the principle of promotion from within, and, in keeping with that principle, the City agrees to focus some of its resources toward those employees in lower job classifications in order to provide opportunities to train and enter new careers.

C. The City and the Union agree that a major goal of training and career development is improvement of the status of female and minority employees in order to fulfill the City's and Union's commitment to effective affirmative action programs, and to make the work force at all levels reasonably representative of the sex and ethnic composition of the City.

D. In consequence of the foregoing, the City and the Union agree:

1. Employees will be recruited from the AFSCME bargaining unit to be trained in programs leading to career advancement. Selection shall be made from among those meeting the prerequisites for the training programs.

2. Specific training and numbers to be trained will be identified by the Career Development and Training Committee, with priorities based upon the City's projected needs. The Committee may also give consideration to provide in-service training opportunities for employees who are on recall lists due to reductions in force.

3. The Career Development Committee will be comprised of three (3) representatives selected by the Union and three (3) representatives selected by the Human Resources Director. The Committee shall meet at mutually agreeable times and places to review career development and in-house training programs and to prepare reports and recommendations to the Human Resources Director.

E. The City and the Union recognize that technological or other changes may occur during the term of this Agreement. Whenever such changes occur, bargaining unit members will be offered opportunity for training, retraining or reassignment whenever possible. (Example: Detroit Resource Management System [DRMS]).

F.  To insure that employees are adequately trained, the Human Resources Department may conduct periodic training need assessments and employee performance reviews.

## 46. SOCIAL SECURITY

The City and the Union agree that the employees represented by Michigan District Council 25 and its affiliated Local Unions and coming under the terms of this Labor Agreement shall continue to be covered under the terms of FICA (Social Security).

## 47. EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION STATEMENT

A.  The City and the Union agree to cooperate in a policy of equal opportunity for all employees: to continue to prohibit discrimination because of race, color, creed, national origin, age, political orientation, sex, sexual orientation, or disability, (See Memorandum of Understanding Re: Precedence of Americans with Disabilities and Michigan Handicappers' Civil Rights Act Obligations to Disabled Persons), and to promote a full realization of equal employment opportunity through a positive and continuing effort.

B.  The City agrees to periodically provide the Union with copies of statistical minority employment information reports and such reports concerning policies and programs for equal opportunity in employment regarding City employees.

C.  The City further agrees that a crucial part of an effective affirmative action program is development of an effective training and education program designed to provide existing minority employees maximum opportunity to advance so as to perform at their highest potential.

D.  Upon request, the Human Resources Director or his/her designated representative(s) shall meet with the Joint Career Development and Training Committee.

## 48. RETIREMENT

A.  Eligibility for Service Retirement Allowance - Any employee who is covered by the provisions of this Agreement and who is a member of the General Retirement System of the City of Detroit who has thirty (30) or more years of credited service may retire upon his/her written application filed with the Board of Trustees setting forth the date, which shall not be less than thirty nor more than ninety days, subsequent to the execution and filing of said written application, he/she desires to be retired. On the date so specified for his/her retirement he/she shall be retired, notwithstanding that pending such period of notification he/she may have separated from City service. Upon his/her retirement he/she shall receive a Retirement Allowance as provided by the City Charter and Municipal Code. Employees may retire on or after July 1, 1992 with 25 years of credited service but less than 30 and receive an actuarially reduced pension which shall

be known as the Actuarially Reduced 25 Year Option of the Retirement Plan. Employees who are receiving a duty or a non-duty disability pension or Income Protection benefits may elect to convert to this new option if they otherwise meet the qualifications.

Employees who have resigned with 25 or more years of service since July 1, 1992, shall have ninety (90) days to submit an application for this option from the date they are officially notified by the Pension Bureau that said application can be processed.

After the initial enrollment of applicants by the Pension Bureau, employees who subsequently leave City employment shall have ninety (90) days from their last paid date on the City payroll to select this option.

Retirees who began receiving a Duty or Non-Duty Disability Pension after July 1, 1992, may convert to this option no later than ninety (90) days after they would have had twenty-five (25) years with the City and have been notified by the Pension Bureau of the availability of this option.

Employees who began receiving Income Protection Benefits after July 1, 1992, may convert to this option anytime after they have had twenty-five (25) years of service with the City.

The above paragraphs notwithstanding, employees hired after January 1, 1996, shall not be eligible for a Service Retirement until they shall have attained fifty-five (55) years of age. This age requirement shall apply to both the Regular Service Retirement with thirty (30) years of service and for pension calculation purposes to the Early Service Retirement (actuarially reduced) with twenty-five (25) or more years of service.

B. Retirement benefits shall be modified to include an optional coordination of benefits between regular retirement benefits and Social Security benefits for those employees who retire from the City with a regular retirement or the Actuarially Reduced 25 Year Option prior to becoming eligible for Social Security payments. Such coordination of benefits shall cause an approximate leveling of total monthly benefits derived from both the City's retirement system and Social Security without creating any additional actuarial costs.

C. For employees hired on or after July 1, 1980, the vesting provisions of the City Retirement Plan shall require ten (10) years of service regardless of age in lieu of the "40 and 8" age and service requirement.

D. For employees who separate from City service with a vested pension prior to reaching eligibility for a regular service retirement, time earned after July 1, 1986 shall not be factored into the formula for determining their pension benefit until they shall have attained age 62. This provision will not affect the current practice governing disabled employees.

In the event that any law, state or federal is passed during the term of this Agreement which permits employees to vest their pension prior to meeting the vesting requirements set forth in this contract, any employee who vests his/her pension in such a manner shall not be eligible for any pension benefits until his/her sixty-second (62nd) birthday.

E.   Employees who become eligible for a pension under the vesting provisions of the plan, shall be ineligible for any of the hospital, medical, optical or dental benefits provided for other retirees, spouses, dependents or beneficiaries.

F.   Subject to the provisions in Section N, employee contributions to the general retirement annuity fund shall be optional. Balances in the fund standing to the individual credit of employees discontinuing contribution shall be maintained with accumulated interest to be paid out to the employee upon separation from the City. Employees qualified under the pension vesting provision of the general retirement system may withdraw their annuity with accumulated interest upon separation.

Upon attainment of twenty-five (25) years of service, an employee shall be eligible to withdraw, one time only prior to retirement, all or part of his/her annuity savings.

Non-Duty and Duty Disability Retirees shall be eligible to withdraw, one time only, all or part of their annuity savings.

G.   At the time of retirement, members of the general City pension system may elect an option which shall entitle them to change their pension option from either option 2 or option 3 to a straight life pension after they have commenced collection of the pension if the member's beneficiary predeceases the member. This shall be known as the Pop-Up Option. The actuarial cost of the change in benefit shall be borne by the member who selects this change in his/her option election.

H.   Employees who retire on or after July 1, 1998, shall have their pensions computed according to the following formula. Using the highest paid 36 consecutive months out of the last 120 including longevity payments, as Average Final Compensation; 1.6% of Average Final Compensation for each year of service for the first 10 years; 1.8% of Average Final Compensation for each year of service for the second 10 years; 2.0% of Average Final Compensation for each year of service greater than 20 years up to 25 years; and 2.2% of Average Final Compensation in excess of 25 years; plus $12 for each year of City service not to exceed $120. In no case shall benefits paid by the Retirement System exceed ninety percent (90%) of Average Final Compensation except in the case where a higher pension amount has been earned in accordance with the provisions in effect prior to July 1, 1992.

I.   Effective for bargaining unit members who retire on or after July 1, 1999, they shall have the option to 1) select the Unused Sick Leave On Retirement payment benefit provided for in Article 29 of this labor agreement, or 2) choose to receive twenty-five percent (25%) of the unused accrued sick leave bank provided in Article 29 and have that sum included in the average final compensation used to compute the membership service pension portion of their retirement allowance. For any member choosing to exercise this option the lump sum payment the member will receive will be the remaining value of the unused accrued sick leave bank as provided in Article 29.

J.   Effective January 1, 1999, the maximum annual amount payable to an individual on a Duty Disability pension shall be increased to $9,000 and for Non-Duty Disability pension to $6,000.

The maximum amount of the Accidental Death Benefit as found in Chapter VI, Article VI, Part C, Section 1, Paragraphs B and C of the City Charter shall be increased from $2,400 to $5,700 per annum.

K. Effective January 1, 1999, minor dependents under age 19 or permanently mentally or physically impaired dependent children who become impaired prior to age 19 of employees who die with 20 years of service without a surviving spouse shall receive a payment of $9,000 per year which shall be divided equally amongst all eligible dependents. The payment will cease when the last minor attains age 19 or for mentally or physically impaired children at death. There shall be no retirement escalator for this payment.

L. In addition to in-service death pension benefits which already exist for employees with 20 or more years of service, effective July 1, 1998, if a bargaining unit member dies after having attained 15 or more but less than 20 years of creditable service at any age below 60, the surviving spouse will be paid a 50% joint and survivor election. Dependent children, if there is no eligible surviving spouse, are to be paid a total of $6,000 which shall be divided equally amongst all eligible dependents until the youngest child reaches age 19, or for life if a child is permanently physically or mentally impaired.

M. The post retirement escalator factor shall increase from 2.0% to 2.25% of original base pension effective July 1, 1992.

N. Pension - Employer Contribution (414h Plan):

Upon notification by the Union to the City of its desire to activate a 414(h) Plan, the City will take steps to implement the provisions contained in the following paragraphs. The Union initiated the discussions and proposed the provisions contained in the paragraphs and the parties recognize and agree that it will take some time before this program can become operational due to the necessity of making changes in the City's computerized payroll system.

It is hereby agreed that every member of this bargaining unit shall be required to make contributions in the amount of 5% of their annual compensation to the Annuity Savings Fund of the General Retirement System. The said 5% employee contribution to the Retirement System Annuity Fund, although designated as employee contributions, shall be paid by the City of Detroit in lieu of contributions by the employee. The employee shall not have the option of choosing to receive the contributed amount directly instead of having them paid by the employer to the annuity fund. There shall be no additional contribution expense to the City of Detroit, and the amounts so contributed by the employer on behalf of the employee shall be treated, for tax purposes, as employer contributions and thus shall not be taxable to the employee until these amounts are distributed or made available to the employee.

These provisions shall not affect the amount or benefit level of the retirement allowance, or the City of Detroit's obligation thereto.

The wage rate for members of the bargaining unit shall not be altered or changed in any way as a result of these contract provisions. Consequently, these provisions shall not affect the basis

upon which Longevity, sick leave payoff, holiday pay, overtime pay, recall pay, final average earnings, etc., or any wage-based benefit is computed.

The AFSCME – Non Supervisory bargaining unit, agrees to indemnify and hold the City harmless with respect to any adverse ruling, if any, and monetary penalty, judgement, or damages to the City as a consequence of the City's compliance with the provisions of this Agreement.

O. Employees shall have the option of selecting from two additional surviving beneficiary options of 25% and 75%.

P. Annuity Contribution Amounts: The City will offer employees who choose to contribute to the annuity plan the option of 3% up to the Social Security maximum salary which would then be increased to 5%, a straight 5%, or a straight 7% contribution.

Q. Members of the bargaining unit shall have the option of belonging to the City's current defined benefit/defined contribution retirement plan or a new defined contribution retirement plan in accordance with the rules the City will issue for a defined contribution plan. The parties agree that the defined contribution plan the Executive Branch will propose for acceptance by the City Council, although not specifically detailed at this time, is intended to be primarily in accordance with the provisions which were last advocated by the Executive Branch in November-December, 1997.

R. Effective July 1, 2003, the membership of the General Retirement System, Board of Trustees [Article II, Section 2, Subsection (1)] shall be modified to provide that one of the trustees is: "The Mayor of the City or his/her designated representative, ex-officio. Such designated person shall be a full-time appointive or classified City employee."

S. All Retirement and Pension Plan Provisions provided for by the City Charter and Municipal Code are incorporated herein by referral unless otherwise specifically modified by this Agreement and Ordinance 2-93, J.C.C. Page 133.


## 49. TUITION REFUND

A. Bargaining unit members may participate in the City's Tuition Refund Program in accordance with the policies as administered by the Human Resources Department. Employees requesting a tuition refund should submit the applications to the human resources officer in their department.

B. Currently, the maximum amount of the tuition refund shall be as indicated below:

1. An eligible employee will be entitled to receive a maximum of $850 per fiscal year to be applied toward tuition in seeking a graduate degree from an accredited university.

2. An eligible employee will be entitled to receive a maximum of $700 per fiscal year to be applied toward tuition in seeking an undergraduate degree from an accredited university.

3. An eligible employee will be entitled to receive a maximum of $600 per fiscal year to be applied toward payment for participation in employee development programs

The above amounts cannot be pyramided to permit any employee to receive more than a total amount of $850 in any fiscal year.

C. Effective July 21, 2003, the maximum amount of the tuition refund shall be increased as indicated below:

1. An eligible employee will be entitled to receive a maximum of $2,000 per fiscal year to be applied toward tuition in seeking a graduate degree from an accredited university.

2. An eligible employee will be entitled to receive a maximum of $1,500 per fiscal year to be applied toward tuition in seeking an undergraduate degree from an accredited university.

3. A eligible employee will be entitled to receive a maximum of $1,200 per fiscal year to be applied toward payment for participation in employee development programs.

The above amounts cannot be pyramided to permit any employee to receive more than a total amount of $2,000 in any fiscal year.

# 50. PROTECTION CLAUSE

It is the City's commitment that in terms of a total compensation package, the AFSCME bargaining unit will not be economically disadvantaged as a result of subsequent settlements with other unions. However, it must be understood that compulsory arbitration may result in varied settlements.

The parties agree that special wage adjustments for particular classifications within other bargaining units, when based upon personnel recruitment and retention difficulties or special job skills, shall not require an equivalent increase for the AFSCME unit at large; the parties further agree, however, that an adjustment shall be required for an AFSCME classification to maintain the recognized traditional wage relationship to another bargaining unit's classification which received such a special wage adjustment.

# 51. CONFIDENTIAL EMPLOYEES

The parties agree that certain City employees are designated as confidential employees and are, therefore, to be exempt from membership in the bargaining unit covered by this Agreement. These employees are those holding the positions as outlined in the Memorandum of Understanding reached by the parties and submitted, and approved by the Michigan Employment Relations Commission in connection with Case No. C79 D-110 as well as the Decision and Order of the Commission in that case dated June 4, 1980. The City shall not designate other employees as confidential without the agreement of the Union; but may, if the Union fails to so agree, petition the Michigan Employment Relations Commission to approve such designation.

# 52. MODIFICATION AND TERMINATION

It is agreed between the parties that this Contract shall continue in full force and effect until 11:59 p.m., June 30, 2005. If either party desires to modify this Contract they shall give written notice during the month of February 2005. Negotiations for a new contract shall commence thirty (30) days after that date.

In the event that the City and the Union fail to arrive at an agreement on wages, fringe benefits, other monetary matters, and non-economic items by June 30, 2005, the Agreement will remain in effect on a day to day basis. Either party may terminate the agreement by giving the other party a ten (10) day written notice on or after June 20, 2005.

The parties agree that this sole and complete Agreement is intended to cover all matters affecting wages, hours, and other terms and conditions of employment and that, during the term of this Agreement, neither the City nor the Union will be required to negotiate on any further matters affecting these or any other subjects not specifically set forth in this Agreement, except by mutual agreement of the parties hereto.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement


on this 1ˢᵗ day of July, 2003.


**MICHIGAN COUNCIL 25,**
**and the Local Unions listed below**
**of the American Federation of**
**State, County and Municipal**
**Employees, AFL-CIO:**                                        **CITY OF DETROIT:**


_____                              _____
ALBERT GARRETT, President                           KWAME M. KILPATRICK, Mayor
AFSCME, Council 25, AFL-CIO                          City of Detroit


_____                              _____
JIMMY A. HEARNS, Staff Specialist                   ROGER N. CHEEK, Director
AFSCME, Council 25, AFL-CIO                          Labor Relations

MICHIGAN COUNCIL 25,
and the Local Unions listed below
of the American Federation of
State, County and Municipal
Employees, AFL-CIO:

CITY OF DETROIT:

_____
ROBERT STOKES, President
Local 23

_____
WENDY BRODEN, Director
Human Resources Department

_____
JAMES FUNDERBURG, President
Local 26

_____
RUTH CARTER, Corporation Counsel
Law Department

_____
EULA MURRAY, President
Local 62

_____
SEAN WERDLOW, Chief Financial
Officer, Finance Department

_____
RIEHL, JOHN, President
Local 207

Approved and Confirmed by the City
Council on _____:

_____
ARMELLA NICKLEBERRY, President
Local 214

_____
JACKIE L. CURRIE, City Clerk

_____
ROGER RICE, President
Local 229

APPROVED AND CONFIRMED BY
THE CITY COUNCIL 1/14/04
                        DATE

_____
SCECILLA HUNT, President
Local 273

JACKIE L. CURRIE
CITY CLERK

_____
LEAMON B. WILSON, President
Local 312

-76-

MICHIGAN COUNCIL 25,
and the Local Unions listed below
of the American Federation of
State, County and Municipal
Employees, AFL-CIO:

_____
LAURIE WALKER, President
Local 457

_____
JANET RICHMOND, President
Local 542

_____
ROBERT DONALD, President
Local 836

_____
SYLVIA GAMBLE, President
Local 1023

_____
ELMIRA WILLIS-STUCKEY, President
Local 1220

_____
DAVID SHOCKLEY, President
Local 1227

_____
GINA THOMPSON, President
Local 1642

_____
GERALDINE CHATMAN, President
Local 2799

_____
EMILY KUNZE, President
Local 2920